UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD SMALLEY, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>HOME DEPOT U.S.A., INC.,<br><br>   Defendant. | Case No. 11-cv-02951-JCS<br><br>**ORDER DENYING DEFENDANT HOME DEPOT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Dkt. No. 76.** |

## I.   INTRODUCTION

This suit arises after the decertification of the class in *Aquilino v. Home Depot, U.S.A.*, No. 04-04100, 2011 WL 564039 (D. New Jersey Feb. 15, 2011). In this particular action, there are seventeen remaining plaintiffs, all of whom are current or former Merchandising Assistant Store Managers at Home Depot U.S.A., Inc. (hereafter "Defendant" or "Home Depot"). Dkt. No. 17. The plaintiffs contend they were denied overtime pay as a result of Home Depot's improper classic classification of them as exempt executives under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*. Before the Court is Home Depot's Motion for Summary Judgment ("Motion") as to Plaintiff Alan A'Neals (hereafter "Plaintiff" or "A'Neals"). Defendant contends that no material fact is in dispute and A'Neals was properly classified as an exempt executive employee from FLSA's rules governing overtime pay. A'Neals asserts that there is a factual dispute as to whether his "primary duty" at Home Depot was management, and therefore, whether he was wrongfully classified as an exempt employee. For the reasons stated below, the Court DENIES Defendant's Motion for Summary Judgment as to Plaintiff Alan A'Neals.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Overview

Home Depot operates large, warehouse-style retail stores that sell a wide range of building materials and home improvement products. Dkt. No. 88 (Corrected Joint Statement of Undisputed Facts) ("JSUF") ¶ 1. Home Depot stores contain up to eleven core merchandising departments: Lumber, Building Materials, Flooring, Paint, Hardware, Plumbing, Electrical, Garden, Kitchen & Bath, Millwork, and Decor. *Id*. ¶ 3. Home Depot employees are tiered. At the bottom are associates; and department supervisors−also called department heads−are one level above associates. Declaration of Donna M. Mezias in Support of Home Depot's Motion for Summary Judgment re Plaintiff Alan A'Neals ("Mezias Decl."), Ex. 1 (Plaintiff A'Neals's Transcript) ("A'Neals Tr.") at 60. Each merchandising department is staffed by a varying number of sales associates and one department supervisor. JSUF ¶ 3. Unlike Merchandizing Associate Sales Managers ("MASMs"), associates and department supervisors are paid on an hourly basis.

MASMs are the next-highest level of employee at Home Depot, only subordinate to the store manager.[2] A'Neals Tr. at 61. Each Home Depot store employs between one to seven MASMs. JSUF ¶ 2. Each MASM is assigned to manage between one and eleven merchandising departments. *Id*. ¶ 3. According to the job description, "providing Customers with a convenient and enjoyable shopping experience" is a high priority for MASMs. Declaration of Olimpio Lee Squitieri in Support of Plaintiff Alan A'Neals' Opposition to Defendant's Motion for Summary Judgment ("Squitieri Decl."), Ex. B (MASM Job Description). The job description also states that MASMs are responsible for "[m]aintaining department profitability," "provid[ing] leadership to Associates," and "[s]etting store objectives and ensuring they are met," among other responsibilities. *Id.*; JSUF ¶ 4. MASMs are salaried employees.

---

[2] A'Neals explains in his declaration that there are other types of assistant manager positions that are not MASMs, such as the human resource manager, the operations assistant manager, and the night assistant manager. Declaration of Alan A'Neals in Support of his Opposition to Home Depot's Motion for Summary Judgment ("A'Neals Decl.") ¶ 12. Although it is unclear whether all assistant managers had the same level of authority, A'Neals asserts that he was not allowed to leave until the night assistant manager was satisfied that the store was clean. *Id.*

A'Neals was hired by Home Depot in 1986 as a sales associate. JSUF ¶ 5. He was promoted to department supervisor after working for Home Depot for approximately one year. *Id*. In August 2002, A'Neals was promoted to MASM at store 3312 in Carson City, Nevada. *Id*. ¶ 6. As a MASM in the Carson City store, A'Neals normally ran the plumbing, hardware and garden departments. *Id*. ¶ 7. During various time periods, he also ran the electrical, lumber, paint, and flooring departments. *Id*. In April 2005, he was transferred to store 3311 in Reno, Nevada. *Id*. ¶ 6. As a MASM in the Reno store, A'Neals ran the plumbing, hardware, garden, and lumber departments. *Id*. ¶ 8. These were the largest departments in the store, with the garden department employing up to thirty-five associates. *Id*.

In total, the departments to which A'Neals was assigned as an MASM employed up to 61 associates at the Reno store and up to 56 associates at the Carson City store. JSUF ¶ 9. Plaintiff was scheduled to work 55 hours a week or more, and most of the time worked between 66 and 70 hours per week. A'Neals Decl. ¶ 3. A'Neals was terminated in March 2007. JSUF ¶ 10.

### B. A'Neals's Job Responsibilities

As an intermediate-level store manager, A'Neals performed a variety of tasks. On the one hand, A'Neals had managerial responsibilities such as supervising and training associates and department supervisors, delegating tasks, monitoring reports, employee evaluations, hiring and promoting, and placing product orders, among other things. JSUF ¶ 69. As a MASM, A'Neals was responsible for the whole store. JSUF ¶¶ 19-20. On the other hand, A'Neals states that he spent 70% of his time helping customers, stocking and resetting shelves, disposing of garbage, unloading trucks, packing freight, operating equipment, sweeping and mopping floors, cleaning the outside of stores, and other manual labor. A'Neals Decl. ¶¶ 12, 20. A'Neals states that he was required to spend much of his time performing these latter tasks because there were too few associates and department supervisors in the store during working hours. *Id*. ¶ 10.

One of A'Neals's responsibilities at Home Depot was to train department supervisors and many new employees. JSUF ¶ 27. He trained new employees on merchandising skills, up-selling products, making work lists, reviewing reports, maintaining the store's appearance, keeping products in-stock, and locating products at other stores. *Id*. ¶ 28. A'Neals "walked the store"

with other employees and shared his knowledge, always leading by example. *Id*. ¶ 73. He taught classes on merchandising, store statistics, and customer service skills. *Id.* ¶ 29. A'Neals also held weekly meetings with his staff where he was able to assign tasks and establish expectations. *Id.* ¶ 25.

A'Neals was also responsible for interviewing and recommending applicants for hire and promotion. JSUF ¶ 30. A'Neals testified that he interviewed "a lot" of people, and although the ultimate hiring decision was made by the store manager and human resources, he could not recall any instance in which his recommendation for hire was not followed. *Id.* A'Neals also had "significant input" with respect to the raises that department supervisors received by virtue of his performance evaluations. *Id*. ¶ 42. A'Neals testified that he "promoted over 100 department supervisors" and assisted more than nine individuals get promoted to assistant manager. *Id*. ¶¶ 43, 45.

As a MASM, A'Neals also ensured that his departments were stocked and looked presentable for customers. JSUF ¶ 46. Although it was the department supervisors' duty to keep their departments in stock, A'Neals was often stocked the departments because he was ultimately held accountable for these duties by the store manager. A'Neals Tr. at 263-65. A'Neals developed a sense for the amount of merchandise the store needed, and had certain authority to state that he needed more of some products. *Id*. ¶ 47. A'Neals had direct contact with vendors and ensured that his departments had the right supply to meet the customer demand in the store. *Id*. ¶ 48.

A'Neals testified that he "felt very strongly" about finding ways to help his store save money. JSUF ¶ 52. He was trained on the overall store budget and profit/loss issues, and was responsible for ensuring that his departments and the store made their weekly sales goals. *Id*. ¶¶ 51, 53. He learned a lot of this information as a department head, and used that information when he became an assistant to make his departments profitable. *Id*. A'Neals also developed a program to reduce store lighting costs that was implemented in a lot of Home Depots. *Id*. ¶ 59. Home Depot's CEO personally called A'Neals to thank him for the idea. *Id*. A'Neals also testified to making his own "plan-o-gram" for the gardening department which helped that department

become more profitable. *Id*. ¶ 50. However, to the extent it was possible, A'Neals was required to follow the plan-o-grams and merchandising action plans designed and determined by Home Depot's corporate headquarters. A'Neals Decl. ¶ 26.

It was Home Depot's priority for all MASMs to serve customers and keep the store well-stocked, neat and presentable. Alan Decl. ¶ 13. A'Neals testified that he spent much of his time personally helping customers with their projects until they were done shopping. A'Neals Tr. at 77, 86. If he began to help a customer, he did not ask an hourly associate to help finish the task "because that was not the Home Depot Way." A'Neals Decl. ¶ 15. The majority of his time was spent dealing with customer issues and problems, and he recognized by others for his ability to work well with customers. *Id*. at 249. He trained other employees in customer service skills, but also asserts that there were not enough employees in the store to meet the customers' needs. *Id*.

A'Neals states in his declaration that after 2002, the store was frequently understaffed with associates. A'Neals Decl. ¶ 8. He believes this was the result of Home Depot's new staffing policy to shift hourly employees from working during open hours to closed hours to handle such tasks as inventory-receiving, coordination and cleaning. *Id*. ¶ 9. A'Neals states that the employees who were moved to the night shift were not replaced with hourly employees working the day shift, which left MASMs to assume the duties of helping customers and other "tasking" duties. *Id*. ¶ 10. A'Neals states that Home Depot made it very clear that the lack of available hourly associates was no excuse for not completing these tasks. *Id*. ¶ 14.

Much of A'Neals's time was spent "walking" his departments. JSUF ¶ 56. Walking the store enabled him to know whether a particular department needed to be cleaned and whether the merchandise was properly labeled and/or out of stock. *Id*. A walk through a department could last as short as a half-hour or as long as four hours depending on the shape of any given department. *Id*. ¶ 57. A'Neals testified that it was the "manager's duty" to walk the department because "you had to know your business." *Id*.

When A'Neals walked the store, he would prepare extensive lists of tasks that needed to be completed. JSUF ¶ 21. Some of these lists could be up to eleven pages long. *Id*. *Id*.; A'Neals Tr. at 60. A'Neals had authority to delegate tasks to department supervisors or associates. JSUF ¶ 33.

1    However, A'Neals states that "[s]everal times there were not employees in the store to delegate
2    out anything." A'Neals Tr. at 60, *see also id.* at 88.  In such instances, A'Neals did the work
3    himself. *Id.*

4    A'Neals did not set the employees' initial schedules or his own schedule. *See* A'Neals Tr.
5    at 61; A'Neals Decl. ¶ 20.  However, when an employee called in sick or the store scheduled a
6    special event, A'Neals was involved in adjusting schedules to meet whatever priorities there were
7    in the store. *Id.* at 61-62.  A'Neals only had limited ability to approve overtime in certain
8    instances when an employee was working with a customer and finishing a sale. JSUF ¶ 36;
9    A'Neals Tr. at 149.  Therefore, there were often times in which A'Neals was not able to call in any
10   employee, and was left to work the floor with minimal staff and had to do several tasks himself.
11   A'Neals Tr. at 65.

12   A'Neals was often the opening and closing manager.  If there were sufficient employees
13   available on the floor, A'Neals had the authority to delegate certain opening and closing
14   procedures to other employees. A'Neals Tr. at 88.  If there were no other employees, however,
15   A'Neals was "stuck doing it [himself.]" *Id.* at 89, 277.  When asked whether he was responsible
16   for ensuring the store was closed accurately and appropriately even when the store was
17   understaffed, A'Neals responded that "the manager told you that he didn't care, that once the
18   departments got all done, it was time for you to go home … if you had to go home at 3:00 o'clock
19   in the morning, until it was all done, that's what you had to do." A'Neals Tr. at 89-90.

20   A'Neals testified that multitasking was a necessary part of his job at Home Depot.  JSUF ¶
21   74.  When he was on the sales floor, he was "always" observing the work of the individuals he
22   worked with. *Id.*  A'Neals explained that, for example, when there was no department head in the
23   hardware department, he would take breaks from working the shelves in the hardware department
24   to supervise employees on the other aisles. *Id.*  However, A'Neals also testified that "a lot of
25   times you kept trying to supervise, and the managers would not let you.  The store managers made
26   you go out and work, made you go do the stock, sometimes work extra long hours until they felt it
27   was done." A'Neals Tr. at 254.

A'Neals was also designated as the "manager on duty" several times per week for four to six hours per day. JSUF ¶ 60. Being manager on duty did not mean that A'Neals was the highest ranking employee in the store because the store manager assigned a manager on duty when he was there. A'Neals Decl. ¶ 18. As the "manager on duty," A'Neals was responsible for answering customer calls for "a manger," examining the whole store to ensure it was safe and stocked, ensuring compliance with all safety guidelines, handling all special service installation and delivery issues, managing the front-end, ensuring appropriate staffing throughout the store, ensuring that displays complied with applicable guidelines, and ensuring that all signs for sales items were correct. JSUF ¶ 61. A'Neals testified that most of the time, he would be asked to address customer-related issues, but he was responsible for dealing with any and every issue that arose while he was the manager on duty. *Id*. ¶ 62. However, even when A'Neals was the manager on duty, he would still spend a lot of time doing associate-level tasks such as helping the customers in the paint department. A'Neals Tr. at 165.

A'Neals was scheduled to work at least 55 hours per week, and was often scheduled to work 80 hours a week. A'Neals Decl. ¶ 3. On average, A'Neals worked 66 to 70 hours per week. *Id.* Once he complained about having to work over eighty hours to the district manager, who told him to "suck it up" because he was salaried and if the store "need[ed] you stocking or cleaning that is what you will do." *Id*. ¶ 20. The store manager did not permit MASMs to miss a scheduled shift unless the MASM could get another MASM to cover that shift. *Id*. ¶ 7. However, the covering MASM would not receive any extra pay or overtime compensation. *Id*. A'Neals states in his declaration that one time when he was severely ill and almost died, the store manager would not get extra help to cover his shift. *Id.*

A'Neals was required to work on his scheduled days off "all the time." A'Neals Tr. at 236. When A'Neals worked on his days off, the store manager told him to not answer calls for management, but rather do particular tasks such as downstocking. *Id.* at 254. One year he worked a month and a half−from the middle of August to the end of September−without one day off. *Id.* Sometimes he worked fourteen hours a day and did not take a lunch break. *Id.* a 237. When it was time to take inventory, which occurred either annually or every six months, A'Neals regularly

7

worked for two weeks without taking a day off. *Id.* at 237-38. One year on his wife's birthday and A'Neals's day off, the store manager made him come in to straighten up the clearance aisle. *Id.* at 237. A'Neals states that any associate or department supervisor could have handled that task. *Id.*

As a midlevel manager, A'Neals both gave and received performance evaluations. A'Neals prepared performance evaluations of department supervisors, and either approved the evaluations that his department supervisors prepared of the sales associates, or prepared theses evaluations himself. JSUF ¶¶ 39-40. A'Neals considered providing associates with feedback and evaluating their performance a very important part of his job because "if they don't know how they are performing, they can't proceed and do a better job down the road." *Id.* ¶ 41.

A'Neals's own performance evaluations show that he also improved. In his 2003 evaluations, A'Neals was heavily criticized for his poor communication skills and failure to "concentrate on completing and maintaining daily 'Out of Stocks' and department maintenance on a continuous basis especially in the electrical department." Mezias Decl. Ex. 4 (2003 Performance Evaluation). He was even placed on a 90-day performance improvement plan. *Id*. However, in 2005, A'Neals was praised in his evaluations for his managerial skills and eagerness to learn more about the company. *Id*., Ex. 5 (2005 Performance Evaluation).

### C. Compensation

A'Neals's highest hourly rate as a department supervisor was $20.00 per hour. JSUF ¶ 12. A'Neals's base salary as a MASM ranged from $49,000 to $56,952 per year. *Id.* ¶ 13. This was calculated on a 40-hour work week. A'Neals Decl. ¶ 4. He received his salary every two weeks and always received the same amount of salary regardless of how many hours he worked. *Id*. In 2004-2005, A'Neals's base salary was $51,500 per year, or $4,291.66 per month. *Id*.

The hourly pay rate for associates at A'Neals's store in 2004-2005 ranged from $7.90 to $16.97 per hour, or $1,369.33 to $2,941.47 per month, based on work weeks of 40 hours. *Id.* ¶ 14. The hourly pay rate for department supervisors at A'Neals' store in 2004-2005 ranged from $11.40 to $21.66 per hour, or $1,976.00 to $3,754.40 per month, based on work weeks of 40 hours. *Id.* ¶ 15.

8

As a MASM, A'Neals was also eligible for an annual performance bonus and stock options. *Id*. ¶ 16. He received bonuses of up to $9,286 per year based on overall store sales and his individual performance. *Id*. A'Neals received 675 stock options in 2003 and 2005. *Id*. As an hourly employee, he was not eligible for either form of compensation. *Id*.

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact," that is, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation omitted). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

## IV. DISCUSSION

The FLSA requires overtime compensation equal to one and one-half times the regular rate for which an employee is employed. 29 U.S.C. § 207(a)(1). However, this requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1). There is no dispute that A'Neals, in his capacity as a MASM, is classified by Home Depot as exempt executive from the FLSA's overtime pay requirements or that Home Depot is an employer to which the FLSA applies.

"FLSA exemptions are to be 'narrowly construed against ... employers' and are to be withheld except as to persons 'plainly and unmistakably within their terms and spirit.'" *Klem v. County of Santa Clara, California*, 208 F.3d 1085, 1089 (9th Cir. 2000) (quoting *Auer v. Robbins*,

519 U.S. 452, 462 (1997)). "The criteria provided by the regulations are absolute and the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protection of the Act." *Nigg v. U.S. Postal Serv.*, 555 F.3d 781, 788 (9th Cir. 2009) (quoting *Bratt v. County of Los Angeles,* 912 F.2d 1066, 1069 (9th Cir.1990)). "It is the burden of an employer to show entitlement to an exemption from the FLSA." *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1112 (9th Cir. 2001). "The scope of the employee's duties is a question of fact, but 'the question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.'" *Costello v. Home Depot U.S.A.*, --- F.Supp.2d ----, No. 11-0953, 2013 WL 839586, at *15 (D. Conn. March 5, 2013) (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

Under the "bona fide executive" exemption, as of 2004, federal regulations exempt an employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week ...;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a). A'Neals does not dispute that he has established three of the four foregoing factors to fall within the FLSA's overtime pay exemption. Dkt. No. 92 (Plaintiff Alan A'Neals' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment) ("Opp.") at 9. A'Neals's salary rate is not less than $455 per week; he customarily and regularly directs the work of two or more other employees; and his suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. *See id*. The sole issue before this Court, therefore, is whether Plaintiff's "primary duty" as a MASM of several departments of Home Depot was managerial. *See* 29 C.F.R. § 541.100(a)(2); Motion for Summary Judgment Against Plaintiff Alan A'Neals ("Motion") at 14-23; Opp. at 8-24.

The regulations provide further guidance as to which work responsibilities qualify as "management." The list of management duties include, but is not limited to:

> [I]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102 (2004). Before 2004, the regulations did not explicitly include the responsibilities of "planning and controlling but budget" or "monitoring or implementing legal compliance measures." 29 C.F.R. § 541.102(b) (2003).

The regulations also provide that the "term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* The regulations list four non-exhaustive factors to consider when determining whether the employee's primary duty is management or to perform non-exempt work:

> (1) The amount of time spent performing exempt work;
> (2) The relative importance of the exempt duties as compared with other types of duties;
> (3) The employee's relative freedom from direct supervision; and
> (4) The relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).[3] The foregoing factors provide the foundation for the Court's following analysis of A'Neal's "primary duty" as a MASM at Home Depot.

---

[3] Before 2004, the regulations included as an explicit additional factor "the frequency with which the employee exercises discretionary power." *See* 29 C.F.R. § 541.700 (2003). Subsequent

11

### A. The Amount of Time Spent Performing Exempt Work

The regulations provide further guidelines as to the first factor in particular:

> The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

29 C.F.R. § 541.700(b).

Plaintiff asserts that he spent at least 70% of his time performing non-exempt work, such as stocking and resetting shelves, disposing of garbage, unloading trucks, packing freight, operating equipment, sweeping and mopping floors, cleaning the outside of stores, and other manual labor. Opp. at 9-10; *see also* A'Neals Decl. ¶¶ 12, 20. Defendant argues that Plaintiff's estimate does not take into account the "multitasking" in which Plaintiff testified he was constantly engaged. Motion at 16. Defendant points to A'Neals's testimony that he was "always" observing the work of the associates and department supervisors he worked with, and that "[y]ou had to multitask… [and] wouldn't survive in Home Depot if you didn't." *Id.* ¶ 74. Defendant argues that particularly for the retail industry, courts often recognize that exempt and non-exempt work is often concurrently performed and does not defeat the executive exemption. Motion at 16 (citing 29 C.F.R. § 541.106).

The Court agrees with the general proposition that exempt and non-exempt tasks may be performed simultaneously. However, Defendant has not produced any evidence to show that

---

to 2004, courts have incorporated this factor into the analysis of an employee's "relative freedom from supervision." *See, e.g., Costello*, 2013 WL 937586, at *17 (citing *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1270 n. 57 (11th Cir. 2008) ("Having discretionary power is one aspect of freedom from supervision.")); *see also* 29 C.F.R. § 541.202(c) ("The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision."). The Court will incorporate the extent of Plaintiff's discretionary power into the analysis of his freedom from supervision.

Plaintiff already did not take his "multitasking" into account when he estimated that 70% of his time was spent performing non-exempt tasks. For instance, Plaintiff testified that he when there was no department supervisor in the hardware department, he took breaks from working the shelves in the hardware department in order to supervise employees in the other aisles. JSUF ¶ 74. Drawing all reasonable inferences in Plaintiff's favor, the Court presumes that Plaintiff properly allocated the time spent working the shelves in the hardware department to his 70% estimate of non-exempt work, and allocated the time spent away from the hardware department and supervising employees in the other aisles to his 30% estimate of managerial work. Defendant provided no evidence of Plaintiff's work allocation besides Plaintiff's own testimony.

Of course, Plaintiff testified that he often worked with associates and "lead by example." JSUF ¶ 73. However, Plaintiff also testified to spending a significant portion of time performing non-exempt tasks on his own because the store was understaffed. A'Neals Tr. at 88-89, 254, 277. When A'Neals worked in excess of his scheduled hours, much of that time was spent downstocking, cleaning, and engaging in other non-exempt tasks. For instance, when A'Neals was required to work on his days off−a frequent occurrence− the store managers explicitly prohibited him from engaging in managerial duties and told him to perform non-exempt tasks such as downstocking. *Id.* at 254.

In light of these facts, the Court rejects Defendant's argument that Plaintiff actually engaged in managerial tasks more than 50% of the time. However, the regulations specifically preclude this factor from being dispositive as to the issue of Plaintiff's "primary duty." *See* 29 C.F.R. § 541.700(b) ("nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work"). "Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.* The Court therefore continues to consider the remaining three factors relevant to the determination of Plaintiff's "primary duty."

### B. The Relative Importance of the Exempt Duties as Compared with Other Types of Duties

The second factor focuses on an employee's "principal value" to the company. *Baldwin*, 266 F.3d at 115. The analysis requires a comparison between the "importance of plaintiff's

1    managerial duties [and his] nonmanagerial duties, keeping mind the end goal of achieving the

2    overall success of the company." *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 505

3    (6th Cir. 2007). For the following reasons, the Court finds that the relative importance of

4    Plaintiff's exempt duties as compared to his non-exempt duties is a disputed issue of material fact

5    which precludes the Court from granting summary judgment in favor of Defendant.

6        The Court acknowledges that A'Neals's managerial duties were important. A'Neals was

7    engaged in hiring, supervising and training department supervisors and associates, delegating

8    tasks, making sure the store was well-stocked, acting as the manager on duty, and reading

9    profit/loss reports, among other things. JSUF ¶ 69. A'Neals's evaluations focus on his ability to

10   manage employees, and A'Neals concedes that managing employees was one of his most

11   important tasks. *Id.* ¶ 18. A'Neals ensured the overall safety of the store, and was always

12   concerned with the store's overall profitability. A'Neals also testified that the stores would not

13   have been able to function profitably, efficiently, and safely if he did not perform his duties as

14   manager on duty. *Id.* ¶ 63.

15       Nevertheless, Defendant has failed to establish that no reasonable jury could find that

16   A'Neals's non-exempt tasks were relatively more important than his managerial duties. The

17   record shows that Home Depot's highest priority was to maintain well-stocked and clean stores to

18   provide customers with a good shopping experience. A'Neals Decl. ¶ 13. Because the store was

19   often understaffed with hourly associates, A'Neals was required to spend the majority of his time

20   helping customers and performing more laborious tasks such as cleaning the store and stocking the

21   aisles with merchandise. *Id.* ¶¶ 8, 10. A'Neals states that Home Depot made it very clear that the

22   lack of available hourly associates was no excuse for not completing various tasks. *Id.* ¶ 14.

23   A'Neals could not go home until every task on the closing list had been completed, and was not

24   allowed to approve overtime for the hourly associates to help. He was required to come in on his

25   days off to perform non-exempt tasks such as downstocking or cleaning a clearance aisle.

26   A'Neals Tr. at 236-38. Once he complained about having to work over eighty hours to the district

27   manager, who told him to "suck it up" because he was salaried and if the store "need[ed] you

28   stocking or cleaning that is what you will do." A'Neals Decl. ¶ 20. These facts give rise to a

reasonable inference that A'Neals's non-exempt tasks were relatively more important to Home Depot, and Home Depot took advantage of the fact that A'Neals was a salaried employee.

Defendant argues that the "primacy of A'Neals' managerial duties is also documented by the way in which Home Depot evaluated him and rewarded him with performance bonuses." Motion at 10. The Court disagrees. While A'Neals's performance evaluations as a whole focus on his managerial duties, he was also criticized in his 2003 evaluation for failing to "concentrate on completing and maintaining daily 'Out of Stocks' and department maintenance," which shows A'Neals was also evaluated on his performance of non-exempt duties. Moreover, the fact A'Neals was eligible for yearly bonuses is not very significant in light of the fact A'Neals's overall pay was not much higher than the wages awarded to hourly employees, which is another factor discussed below.

The Court notes as a final point that Plaintiff may have conceded that his management duties were "essential" and "very important" to the store, but such statements do not satisfy Defendant's heavy burden on summary judgment. Plaintiff's deposition testimony is Defendant's primary source of evidence, yet Plaintiff was never asked at his deposition to compare the relative importance of his managerial and other duties. Defendant did not submit one declaration from any Home Depot employee who asserts that Plaintiff's managerial duties were his most important duties. When all reasonable inferences must be drawn in favor of the nonmoving party, the Court will not presume that such evidence exists.[4]

### C.    The Employee's Relative Freedom from Direct Supervision

The evidence before the Court does not suggest that Plaintiff was relatively free from supervision. To the contrary, the record shows that A'Neals was closely supervised by his store manager, which is also reflected in his performance evaluations. *See* Mezias Decl. Exs. 4-5.

---

[4] To this end, the Court rejects Defendant's argument that Plaintiff submitted a post-deposition declaration that contradicts earlier representations made at his deposition. For example, A'Neals did not contradict his deposition testimony that he was responsible for addressing "every" issue that arose when he was manager on duty by later explaining in his declaration that he was still not "in charge" of the store because the store manager was still present. *See* Reply at 3; *see also Clougher v. Home Depot U.S.A., Inc.*, 696 F.Supp.2d 285, 292 n. 7 (E.D.N.Y. 2010) ("this Court finds nothing in Clougher's Declaration that is patently inconsistent with his prior testimony, nor so incredible as to render it a sham instrument").

A'Neals repeatedly testified that the store manager often told him what specific tasks he needed to perform, and held him accountable if any of his departments were not stocked and clean. A'Neals Tr. at 254, 263-65. When A'Neals worked on his days off, the store manager specifically told him to avoid any managerial responsibilities and to engage in other tasks such as downstocking. *Id.* at 254. A'Neals was not allowed to leave until the night operations manager (not the store manager) believed the store was clean enough for him to go. A'Neals Decl. ¶ 12. Moreover, the record reveals no instances in which A'Neals was the top-ranking employee at the store because even when he was manager on duty, the store manager was still present. *Id*. ¶ 18. A'Neals is not, therefore, similarly situated to the plaintiffs in *Baldwin*, who were merely required to complete tasks on checklists, but "free from daily supervision." *Baldwin*, 266 F.3d at 1115.

The record also indicates that A'Neals lacked sufficient discretion to retain control over his managerial responsibilities. *See Morgan*, 551 F.3d at 1270 n. 57 ("Having discretionary power is one aspect of freedom from supervision."). A'Neals did not create his own schedule or the schedules of the department heads and associates. The store manager did not permit MASMs to miss a scheduled shift unless the MASM could get another MASM to cover that shift. *Id.* ¶ 7. A'Neals did not have authority to approve overtime of hourly employees except for in limited circumstances. He was unable, therefore, to approve overtime for an employee who could have helped him close the store and thereby reduce his own hours. Rather, he was often compelled to work 80 hours per week because he lacked such discretion.

Although Home Depot valued A'Neals recommendations for hire, and on occasion, A'Neals implemented his own plan-o-grams for the store's design, the record lacks sufficient evidence to show that A'Neals had discretionary authority in any significant respect. At least one other court has also found that there is a disputed issue of fact as to whether a MASM "made decisions sufficient to affect Home Depot's policies or otherwise bind the business in any meaningful way." *Clougher*, 696 F.Supp.2d at 292. This factor weighs in favor of finding that management was not Plaintiff's primary duty.

//

//

16

### D. The Relationship Between the Employee's Salary and the Wages Paid to other Employees for the Kind of Nonexempt Work Performed by the Employee

It is undisputed that A'Neals's base salary as a MASM ranged from $49,000 to $56,952 per year. JSUF ¶ 12. If the Court converts A'Neals's salary into an hourly wage based on his contractual 40-hour work week and a 52 week per year work schedule, his hourly rate would have ranged from $23.56 to $27.78. The parties also stipulated that A'Neals received bonuses of up to $9,286 per year based on overall store sales and his individual performance, and was also eligible to receive stock options.[5] JSUF ¶ 16. Accounting for a $9,286 bonus, A'Neals's hourly rate ranged from $28.02 to $31.85 based on a 40-hour work week. The hourly pay rate for department supervisors at A'Neals's store in 2004-2005 ranged from $11.40 to $21.66 per hour. JSUF ¶ 15. Needless to say, there is a significant difference in these figures.

Nevertheless, the record is replete with evidence that A'Neals *never* worked a 40-hour work week because he was not allowed to work less than 55 hours per week. In fact, A'Neals states that he worked up to 80 hours per week, and worked 66 to 70 hours on average. A'Neals Dec. ¶ 3. Other district courts presented with the same question have considered MASMs' hours worked in addition to the 40-hour work week. *See Clougher*, 696 F.Supp.2d at 293; *Costello*, 2013 WL 837586, at *23. On Defendant's motion for summary judgment, where all reasonable inferences must be drawn in Plaintiff's favor, it makes no sense to disregard the fact that Defendant worked more than 40 hours per week.

Defendant argues that the Court should not consider these additional hours because in *Baldwin*, the Ninth Circuit simply compared the plaintiff's monthly salary despite knowing that the manager-plaintiffs worked more hours than their assistant managers. Motion at 22 (citing *Baldwin*, 266 F.3d at 1115; *Taylor v. AutoZone Inc.*, No. 10-8125, 2012 WL 254238 (D. Ariz. Jan. 27, 2012) (citing *Baldwin* and declining to account for extra hours)). Defendant reads too much into *Baldwin*. The Ninth Circuit has never stated or implied that additional hours should not be taken into account. Rather, in *Baldwin*, the plaintiffs' salaries were compared to the salaries of the next-highest employees, and the process was much easier than it is here because there was no need

---

[5] Although the Court cannot quantify any available stock options without knowing their value, the Court acknowledges that this would increase Plaintiff's wage.

to convert a salary into an hourly wage or vice versa. *See Baldwin*, 266 F.3d at 1115. The court never even acknowledged how many additional hours the plaintiffs claimed to have worked. Moreover, the court considered the fact the plaintiffs' compensation increased by virtue of their better work-provided living arrangements, which implies that all factors relevant to compensation should be taken into account. *See id.*

The Court calculates Plaintiff's hypothetical hourly wage based on the following: (1) a 68-hour work week−the average of Plaintiff's estimated average of 66 to 70 hours; (2) a 52 week per year work schedule; (3) a salary ranging from $49,000 to $56,952 per year; and (4) a $9,286 bonus added to Plaintiff's salary. Thus, the Court finds that Plaintiff's hypothetical hourly wage ranges from $16.48 to $18.73. This is *less* than the $21.66 hourly rate paid to the highest-earning department supervisor at Plaintiff's store. All factors considered, Defendant has failed to establish that Plaintiff is paid any greater amount than the hourly employees ranking below him. Therefore, the last factor in the "primary duty" analysis also weighs in favor of denying Defendant's motion.

*          *          *

The regulations state, in particular for "assistant managers in a retail establishment," that "if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement." 29 C.F.R. § 541.700. Here, the evidence indicates that Plaintiff was closely supervised, and accounting for hours worked in addition to the 40-hour work week, Plaintiff earned *less* than the most comparable nonexempt employees. Moreover, disputed issues of material fact exist as to the amount of time A'Neals spent on non-exempt tasks, and the relative importance of his managerial duties as compared to his non-exempt duties. In light of these findings, Defendant has not met its burden of showing that no reasonable jury could find that Plaintiff's "primary duty" as a MASM at Home Depot was not to perform managerial tasks.

V.   **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

Dated: April 5, 2013

1
2
3   _____
    Joseph C. Spero
    United States Magistrate Judge
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28